(Slip Opinion)          OCTOBER TERM, 2014          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, ET AL. *v*. SHEEHAN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 13–1412.   Argued March 23, 2015—Decided May 18, 2015

Respondent Sheehan lived in a group home for individuals with mental illness. After Sheehan began acting erratically and threatened to kill her social worker, the City and County of San Francisco (San Francisco) dispatched police officers Reynolds and Holder to help escort Sheehan to a facility for temporary evaluation and treatment. When the officers first entered Sheehan's room, she grabbed a knife and threatened to kill them. They retreated and closed the door. Concerned about what Sheehan might do behind the closed door, and without considering if they could accommodate her disability, the officers reentered her room. Sheehan, knife in hand, again confronted them. After pepper spray proved ineffective, the officers shot Sheehan multiple times. Sheehan later sued petitioner San Francisco for, among other things, violating Title II of the Americans with Disabilities Act of 1990 (ADA) by arresting her without accommodating her disability. See 42 U. S. C. §12132. She also sued petitioners Reynolds and Holder in their personal capacities under 42 U. S. C. §1983, claiming that they violated her Fourth Amendment rights. The District Court granted summary judgment because it concluded that officers making an arrest are not required to determine whether their actions would comply with the ADA before protecting themselves and others, and also that Reynolds and Holder did not violate the Constitution. Vacating in part, the Ninth Circuit held that the ADA applied and that a jury must decide whether San Francisco should have accommodated Sheehan. The court also held that Reynolds and Holder are not entitled to qualified immunity because it is clearly established that, absent an objective need for immediate entry, officers cannot forcibly enter the home of an armed, mentally ill

person who has been acting irrationally and has threatened anyone who enters.

*Held*:

1. The question whether §12132 "requires law enforcement officers to provide accommodations to an armed, violent, and mentally ill suspect in the course of bringing the suspect into custody," Pet. for Cert. i, is dismissed as improvidently granted. Certiorari was granted on the understanding that San Francisco would argue that Title II of the ADA does not apply when an officer faces an armed and dangerous individual. Instead, San Francisco merely argues that Sheehan was not "qualified" for an accommodation, §12132, because she "pose[d] a direct threat to the health or safety of others," which threat could not "be eliminated by a modification of policies, practices or procedures, or by the provision of auxiliary aids or services," 28 CFR §§35.139(a), 35.104. This argument was not passed on by the court below. The decision to dismiss this question as improvidently granted, moreover, is reinforced by the parties' failure to address the related question whether a public entity can be vicariously liable for damages under Title II for an arrest made by its police officers. Pp. 7–10.

2. Reynolds and Holder are entitled to qualified immunity from liability for the injuries suffered by Sheehan. Public officials are immune from suit under 42 U. S. C. §1983 unless they have "violated a statutory or constitutional right that was '""clearly established"'"' at the time of the challenged conduct," *Plumhoff* v. *Rickard*, 572 U. S. ___, ___, an exacting standard that "gives government officials breathing room to make reasonable but mistaken judgments," *Ashcroft* v. *al-Kidd*, 563 U. S. ___, ___. The officers did not violate the Fourth Amendment when they opened Sheehan's door the first time, and there is no doubt that they could have opened her door the second time without violating her rights had Sheehan not been disabled. Their use of force was also reasonable. The only question therefore is whether they violated the Fourth Amendment when they decided to reopen Sheehan's door rather than attempt to accommodate her disability. Because any such Fourth Amendment right, even assuming it exists, was not clearly established, Reynolds and Holder are entitled to qualified immunity. Likewise, an alleged failure on the part of the officers to follow their training does not itself negate qualified immunity where it would otherwise be warranted. Pp. 10–17.

Certiorari dismissed in part; 743 F. 3d 1211, reversed in part and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, GINSBURG, and SOTOMAYOR, JJ., joined. SCALIA,

Syllabus

J., filed an opinion concurring in part and dissenting in part, in which KAGAN, J., joined. BREYER, J., took no part in the consideration or decision of the case.

1

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–1412

## CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, ET AL., PETITIONERS *v.* TERESA SHEEHAN

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 18, 2015]

JUSTICE ALITO delivered the opinion of the Court.

We granted certiorari to consider two questions relating to the manner in which San Francisco police officers arrested a woman who was suffering from a mental illness and had become violent. After reviewing the parties' submissions, we dismiss the first question as improvidently granted. We decide the second question and hold that the officers are entitled to qualified immunity because they did not violate any clearly established Fourth Amendment rights.

I

Petitioners are the City and County of San Francisco, California (San Francisco), and two police officers, Sergeant Kimberly Reynolds and Officer Kathrine Holder. Respondent is Teresa Sheehan, a woman who suffers from a schizoaffective disorder. Because this case arises in a summary judgment posture, we view the facts in the light most favorable to Sheehan, the nonmoving party. See, *e.g., Plumhoff* v. *Rickard*, 572 U. S. \_\_\_, \_\_\_–\_\_\_ (2014) (slip op., at 1–2).

In August 2008, Sheehan lived in a group home for people dealing with mental illness. Although she shared common areas of the building with others, she had a private room. On August 7, Heath Hodge, a social worker who supervised the counseling staff in the building, attempted to visit Sheehan to conduct a welfare check. Hodge was concerned because Sheehan had stopped taking her medication, no longer spoke with her psychiatrist, and reportedly was no longer changing her clothes or eating. See 743 F. 3d 1211, 1218 (CA9 2014); App. 23–24.

Hodge knocked on Sheehan's door but received no answer. He then used a key to enter her room and found Sheehan on her bed. Initially, she would not respond to questions. But she then sprang up, reportedly yelling, "Get out of here! You don't have a warrant! I have a knife, and I'll kill you if I have to." Hodge left without seeing whether she actually had a knife, and Sheehan slammed the door shut behind him. See 743 F. 3d, at 1218.

Sheehan, Hodge realized, required "some sort of intervention," App. 96, but he also knew that he would need help. Hodge took steps to clear the building of other people and completed an application to have Sheehan detained for temporary evaluation and treatment. See Cal. Welf. & Inst. Code Ann. §5150 (West 2015 Cum. Supp.) (authorizing temporary detention of someone who "as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled"). On that application, Hodge checked off boxes indicating that Sheehan was a "threat to others" and "gravely disabled," but he did not mark that she was a danger to herself. 743 F. 3d, at 1218. He telephoned the police and asked for help to take Sheehan to a secure facility.

Officer Holder responded to police dispatch and headed toward the group home. When she arrived, Holder reviewed the temporary-detention application and spoke

with Hodge. Holder then sought assistance from Sergeant Reynolds, a more experienced officer. After Reynolds arrived and was brought up to speed, Hodge spoke with a nurse at the psychiatric emergency services unit at San Francisco General Hospital who said that the hospital would be able to admit Sheehan.

Accompanied by Hodge, the officers went to Sheehan's room, knocked on her door, announced who they were, and told Sheehan that "we want to help you." App. 36. When Sheehan did not answer, the officers used Hodge's key to enter the room. Sheehan reacted violently. She grabbed a kitchen knife with an approximately 5-inch blade and began approaching the officers, yelling something along the lines of "I am going to kill you. I don't need help. Get out." *Ibid.* See also *id.*, at 284 ("[Q.] Did you tell them I'll kill you if you don't get out of here? A. Yes"). The officers—who did not have their weapons drawn—"retreated and Sheehan closed the door, leaving Sheehan in her room and the officers and Hodge in the hallway." 743 F. 3d, at 1219. The officers called for backup and sent Hodge downstairs to let in reinforcements when they arrived.

The officers were concerned that the door to Sheehan's room was closed. They worried that Sheehan, out of their sight, might gather more weapons—Reynolds had already observed other knives in her room, see App. 228—or even try to flee through the back window, *id.*, at 227. Because Sheehan's room was on the second floor, she likely would have needed a ladder to escape. Fire escapes, however, are common in San Francisco, and the officers did not know whether Sheehan's room had such an escape. (Neither officer asked Hodge about a fire escape, but if they had, it seems he "probably" would have said there was one, *id.*, at 117). With the door closed, all that Reynolds and Holder knew for sure was that Sheehan was unstable, she had just threatened to kill three people, and she had a

weapon.[1]

Reynolds and Holder had to make a decision. They could wait for backup—indeed, they already heard sirens. Or they could quickly reenter the room and try to subdue Sheehan before more time elapsed. Because Reynolds believed that the situation "required [their] immediate attention," *id*., at 235, the officers chose reentry. In making that decision, they did not pause to consider whether Sheehan's disability should be accommodated. See 743 F. 3d, at 1219. The officers obviously knew that Sheehan was unwell, but in Reynolds' words, that was "a secondary issue" given that they were "faced with a violent woman who had already threatened to kill her social worker" and "two uniformed police officers." App. 235.

The officers ultimately decided that Holder—the larger officer—should push the door open while Reynolds used pepper spray on Sheehan. With pistols drawn, the officers moved in. When Sheehan, knife in hand, saw them, she again yelled for them to leave. She may also have again said that she was going to kill them. Sheehan is "not sure" if she threatened death a second time, *id*., at 284, but "concedes that it was her intent to resist arrest and to use the knife," 743 F. 3d, at 1220. In any event, Reynolds began pepper-spraying Sheehan in the face, but Sheehan would not drop the knife. When Sheehan was only a few

_____

[1] The officers also may have feared that another person was with Sheehan. Reynolds testified that the officers had not been "able to do a complete assessment of the entire room." App. 38. Sheehan, by contrast, testified during a deposition that the officers "could see . . . that no one else was in the room." *Id*., at 279. Before the Ninth Circuit, Sheehan conceded that some of her deposition testimony "smacks of irrationality that begs the question whether any of it is credible." Brief for Appellant in No. 11–16401 (CA9), p. 41; see also Reply Brief in No. 11–16401, p. 17 (explaining that "the inherent inconsistences in her testimony cast suspicion over all of it"). We need not decide whether there is a genuine dispute of fact here because the officers' other, independent concerns make this point immaterial.

feet away, Holder shot her twice, but she did not collapse. Reynolds then fired multiple shots.[2] After Sheehan finally fell, a third officer (who had just arrived) kicked the knife out of her hand. Sheehan survived.

Sometime later, San Francisco prosecuted Sheehan for assault with a deadly weapon, assault on a peace officer with a deadly weapon, and making criminal threats. The jury acquitted Sheehan of making threats but was unable to reach a verdict on the assault counts, and prosecutors decided not to retry her.

Sheehan then brought suit, alleging, among other things, that San Francisco violated the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 327, 42 U. S. C. §12101 *et seq.,* by subduing her in a manner that did not reasonably accommodate her disability. She also sued Reynolds and Holder in their personal capacities under Rev. Stat. §1979, 42 U. S. C. §1983, for violating her Fourth Amendment rights. In support of her claims, she offered testimony from a former deputy police chief, Lou Reiter, who contended that Reynolds and Holder fell short of their training by not using practices designed to minimize the risk of violence when dealing with the mentally ill.

The District Court granted summary judgment for petitioners. Relying on *Hainze* v. *Richards*, 207 F. 3d 795 (CA5 2000), the court held that officers making an arrest are not required "to first determine whether their actions would comply with the ADA before protecting themselves and others." App. to Pet. for Cert. 80. The court also held that the officers did not violate the Fourth Amendment. The court wrote that the officers "had no way of knowing

––––––––––

[2] There is a dispute regarding whether Sheehan was on the ground for the last shot. This dispute is not material: "Even if Sheehan was on the ground, she was certainly not subdued." 743 F. 3d 1211, 1230 (CA9 2014).

whether [Sheehan] might escape through a back window or fire escape, whether she might hurt herself, or whether there was anyone else in her room whom she might hurt." *Id.*, at 71. In addition, the court observed that Holder did not begin shooting until it was necessary for her to do so in order "to protect herself" and that "Reynolds used deadly force only after she found that pepper spray was not enough force to contain the situation." *Id.*, at 75, 76–77.

On appeal, the Ninth Circuit vacated in part. Relevant here, the panel held that because the ADA covers public "services, programs, or activities," §12132, the ADA's accommodation requirement should be read to "to encompass 'anything a public entity does,'" 743 F. 3d, at 1232. The Ninth Circuit agreed "that exigent circumstances inform the reasonableness analysis under the ADA," *ibid.,* but concluded that it was for a jury to decide whether San Francisco should have accommodated Sheehan by, for instance, "respect[ing] her comfort zone, engag[ing] in nonthreatening communications and us[ing] the passage of time to defuse the situation rather than precipitating a deadly confrontation." *Id.,* at 1233.

As to Reynolds and Holder, the panel held that their initial entry into Sheehan's room was lawful and that, after the officers opened the door for the second time, they reasonably used their firearms when the pepper spray failed to stop Sheehan's advance. Nonetheless, the panel also held that a jury could find that the officers "provoked" Sheehan by needlessly forcing that second confrontation. *Id.,* at 1216, 1229. The panel further found that it was clearly established that an officer cannot "forcibly enter the home of an armed, mentally ill subject who had been acting irrationally and had threatened anyone who entered when there was no objective need for immediate entry." *Id.,* at 1229. Dissenting in part, Judge Graber would have held that the officers were entitled to qualified immunity.

San Francisco and the officers petitioned for a writ of certiorari and asked us to review two questions. We granted the petition. 574 U. S. ___ (2014).

## II

Title II of the ADA commands that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U. S. C. §12132. The first question on which we granted review asks whether this provision "requires law enforcement officers to provide accommodations to an armed, violent, and mentally ill suspect in the course of bringing the suspect into custody." Pet. for Cert. i. When we granted review, we understood this question to embody what appears to be the thrust of the argument that San Francisco made in the Ninth Circuit, namely that "'Title II *does not apply* to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life.'" Brief for Appellees in No. 11–16401 (CA9), p. 36 (quoting *Hainze, supra,* at 801; emphasis added); see also Brief for Appellees in No. 11–16401, at 37 (similar).

As San Francisco explained in its reply brief at the certiorari stage, resolving its "question presented" "does not require a fact-intensive 'reasonable accommodation' inquiry," since "the only question for this Court to resolve is whether any accommodation of an armed and violent individual is reasonable or required under Title II of the ADA." Reply to Brief in Opposition 3.

Having persuaded us to grant certiorari, San Francisco chose to rely on a different argument than what it pressed below. In its brief in this Court, San Francisco focuses on

the statutory phrase "qualified individual," §12132, and a regulation declaring that Title II "does not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others."   28 CFR §35.139(a) (2014). Another regulation defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices or procedures, or by the provision of auxiliary aids or services." §35.104.   Putting these authorities together, San Francisco argues that "a person who poses a direct threat or significant risk to the safety of others is not qualified for accommodations under the ADA," Brief for Petitioners 17. Contending that Sheehan clearly posed a "direct threat," San Francisco concludes that she was therefore not "qualified" for an accommodation.

Though, to be sure, this "qualified" argument does appear in San Francisco's certiorari petition, San Francisco never hinted at it in the Ninth Circuit.  The Court does not ordinarily decide questions that were not passed on below.  More than that, San Francisco's new argument effectively concedes that the relevant provision of the ADA, 42 U. S. C. §12132, *may* "requir[e] law enforcement officers to provide accommodations to an armed, violent, and mentally ill suspect in the course of bringing the suspect into custody."  Pet. for Cert. i.  This is so because there may be circumstances in which any "significant risk" presented by "an armed, violent, and mentally ill suspect" can be "eliminated by a modification of policies, practices or procedures, or by the provision of auxiliary aids or services."

The argument that San Francisco now advances is predicated on the proposition that the ADA governs the manner in which a qualified individual with a disability is arrested.  The relevant provision provides that a public

entity may not "exclud[e]" a qualified individual with a disability from "participat[ing] in," and may not "den[y]" that individual the "benefits of[,] the services, programs, or activities of a public entity." §12132.  This language would apply to an arrest if an arrest is an "activity" in which the arrestee "participat[es]" or from which the arrestee may "benefi[t]."

This same provision also commands that "no qualified individual with a disability shall be . . . subjected to discrimination by any [public] entity." *Ibid.*  This part of the statute would apply to an arrest if the failure to arrest an individual with a mental disability in a manner that reasonably accommodates that disability constitutes "discrimination." *Ibid.*

Whether the statutory language quoted above applies to arrests is an important question that would benefit from briefing and an adversary presentation.  But San Francisco, the United States as *amicus curiae*, and Sheehan all argue (or at least accept) that §12132 applies to arrests.  No one argues the contrary view.  As a result, we do not think that it would be prudent to decide the question in this case.

Our decision not to decide whether the ADA applies to arrests is reinforced by the parties' failure to address a related question: whether a public entity can be liable for damages under Title II for an arrest made by its police officers.  Only public entities are subject to Title II, see, *e.g., Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 208 (1998), and the parties agree that such an entity can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees.  See Tr. of Oral Arg. 10–12, 22.  But we have never decided whether that is correct, and we decline to do so here, in the absence of adversarial briefing.

Because certiorari jurisdiction exists to clarify the law, its exercise "is not a matter of right, but of judicial discre-

tion." Supreme Court Rule 10. Exercising that discretion, we dismiss the first question presented as improvidently granted. See, *e.g., Board of Trustees of Univ. of Ala.* v. *Garrett*, 531 U. S. 356, 360, n. 1 (2001) (partial dismissal); *Parker* v. *Dugger*, 498 U. S. 308, 323 (1991) (same).

### III

The second question presented is whether Reynolds and Holder can be held personally liable for the injuries that Sheehan suffered. We conclude they are entitled to qualified immunity.[3]

Public officials are immune from suit under 42 U. S. C. §1983 unless they have "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Plumhoff*, 572 U. S., at ___ (slip op., at 12) (internal quotation marks omitted). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have under-

_____

[3] Not satisfied with dismissing question one, which concerns *San Francisco's* liability, our dissenting colleagues would further punish San Francisco by dismissing question two as well. See *post*, at 3 (opinion of SCALIA, J.) (arguing that deciding the second question would "reward" San Francisco and "spar[e it] the significant expense of defending the suit, and satisfying any judgment, against the individual petitioners"). But question two concerns the *liability of the individual officers.* Whatever contractual obligations San Francisco may (or may not) have to represent and indemnify the officers are not our concern. At a minimum, these officers have a personal interest in the correctness of the judgment below, which holds that they may have violated the Constitution. Moreover, when we granted the petition, we determined that both questions independently merited review. Because of the importance of qualified immunity "to society as a whole," *Harlow* v. *Fitzgerald*, 457 U. S. 800, 814 (1982), the Court often corrects lower courts when they wrongly subject individual officers to liability. See, *e.g., Carroll* v. *Carman,* 574 U. S. ___ (2014) (*per curiam*); *Wood* v. *Moss*, 572 U. S. ___ (2014); *Plumhoff* v. *Rickard*, 572 U. S. ___ (2014); *Stanton* v. *Sims*, 571 U. S. ___ (2013) (*per curiam*); *Reichle* v. *Howards*, 566 U. S. ___ (2012).

stood that he was violating it," *ibid.,* meaning that "existing precedent . . . placed the statutory or constitutional question beyond debate." *Ashcroft* v. *al-Kidd*, 563 U. S. ___, ___ (2011) (slip op., at 9). This exacting standard "gives government officials breathing room to make reasonable but mistaken judgments" by "protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.,* at ___ (slip op., at 12).

In this case, although we disagree with the Ninth Circuit's ultimate conclusion on the question of qualified immunity, we agree with its analysis in many respects. For instance, there is no doubt that the officers did not violate any federal right when they opened Sheehan's door the first time. See 743 F. 3d, at 1216, 1223. Reynolds and Holder knocked on the door, announced that they were police officers, and informed Sheehan that they wanted to help her. When Sheehan did not come to the door, they entered her room. This was not unconstitutional. "[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006). See also *Kentucky* v. *King*, 563 U. S. ___, ___ (2011) (slip op., at 6).

Nor is there any doubt that had Sheehan not been disabled, the officers could have opened her door the second time without violating any constitutional rights. For one thing, "because the two entries were part of a single, continuous search or seizure, the officers [were] not required to justify the continuing emergency with respect to the second entry." 743 F. 3d, at 1224 (following *Michigan* v. *Tyler*, 436 U. S. 499, 511 (1978)). In addition, Reynolds and Holder knew that Sheehan had a weapon and had threatened to use it to kill three people. They also knew that delay could make the situation more dangerous. The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay "would

gravely endanger their lives or the lives of others." *War-den, Md. Penitentiary* v. *Hayden*, 387 U. S. 294, 298–299 (1967). This is true even when, judged with the benefit of hindsight, the officers may have made "some mistakes." *Heien* v. *North Carolina*, 574 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 5). The Constitution is not blind to "the fact that police officers are often forced to make split-second judgments." *Plumhoff*, *supra*, at \_\_\_ (slip op., at 8).

We also agree with the Ninth Circuit that after the officers opened Sheehan's door the second time, their use of force was reasonable. Reynolds tried to subdue Sheehan with pepper spray, but Sheehan kept coming at the officers until she was "only a few feet from a cornered Officer Holder." 743 F. 3d, at 1229. At this point, the use of potentially deadly force was justified. See *Scott* v. *Harris*, 550 U. S. 372, 384 (2007). Nothing in the Fourth Amendment barred Reynolds and Holder from protecting themselves, even though it meant firing multiple rounds. See *Plumhoff*, *supra*, at \_\_\_ (slip op., at 11).

The real question, then, is whether, despite these dangerous circumstances, the officers violated the Fourth Amendment when they decided to reopen Sheehan's door rather than attempting to accommodate her disability. Here we come to another problem. San Francisco, whose attorneys represent Reynolds and Holder, devotes scant briefing to this question. Instead, San Francisco argues almost exclusively that even if it is assumed that there was a Fourth Amendment violation, the right was not clearly established. This Court, of course, could decide the constitutional question anyway. See *Pearson* v. *Callahan*, 555 U. S. 223, 242 (2009) (recognizing discretion). But because this question has not been adequately briefed, we decline to do so. See *id.*, at 239. Rather, we simply decide whether the officers' failure to accommodate Sheehan's illness violated clearly established law. It did not.

To begin, nothing in our cases suggests the constitu-

tional rule applied by the Ninth Circuit.  The Ninth Circuit focused on *Graham* v. *Connor*, 490 U. S. 386 (1989), but *Graham* holds only that the "'objective reasonableness'" test applies to excessive-force claims under the Fourth Amendment.  See *id.*, at 388.  That is far too general a proposition to control this case.  "We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *al-Kidd*, *supra*, at ___ (citation omitted) (slip op., at 10); cf. *Lopez* v. *Smith*, 574 U. S. ___, ___ (2014) (*per curiam*) (slip op., at 5).  Qualified immunity is no immunity at all if "clearly established" law can simply be defined as the right to be free from unreasonable searches and seizures.

Even a cursory glance at the facts of *Graham* confirms just how different that case is from this one.  That case did not involve a dangerous, obviously unstable person making threats, much less was there a weapon involved. There is a world of difference between needlessly withholding sugar from an innocent person who is suffering from an insulin reaction, see *Graham*, *supra*, at 388–389, and responding to the perilous situation Reynolds and Holder confronted.  *Graham* is a nonstarter.

Moving beyond *Graham*, the Ninth Circuit also turned to two of its own cases.  But even if "a controlling circuit precedent could constitute clearly established federal law in these circumstances," *Carroll* v. *Carman*, 574 U. S. ___, ___ (2014) (*per curiam*) (slip op., at 4), it does not do so here.

The Ninth Circuit first pointed to *Deorle* v. *Rutherford*, 272 F. 3d 1272 (CA9 2001), but from the very first paragraph of that opinion we learn that *Deorle* involved an officer's use of a beanbag gun to subdue "an emotionally disturbed" person who "was unarmed, had not attacked or even touched anyone, had generally obeyed the instructions given him by various police officers, and had not committed any serious offense."  *Id.*, at 1275.  The officer

there, moreover, "observed Deorle at close proximity for about five to ten minutes before shooting him" in the face. See *id.*, at 1281. Whatever the merits of the decision in *Deorle*, the differences between that case and the case before us leap from the page. Unlike Deorle, Sheehan was dangerous, recalcitrant, law-breaking, and out of sight.

The Ninth Circuit also leaned on *Alexander* v. *City and County of San Francisco*, 29 F. 3d 1355 (CA9 1994), another case involving mental illness. There, officials from San Francisco attempted to enter Henry Quade's home "for the primary purpose of arresting him" even though they lacked an arrest warrant. *Id.*, at 1361. Quade, in response, fired a handgun; police officers "shot back, and Quade died from gunshot wounds shortly thereafter." *Id.*, at 1358. The panel concluded that a jury should decide whether the officers used excessive force. The court reasoned that the officers provoked the confrontation because there were no "exigent circumstances" excusing their entrance. *Id.*, at 1361.

*Alexander* too is a poor fit. As Judge Graber observed below in her dissent, the Ninth Circuit has long read *Alexander* narrowly. See 743 F. 3d, at 1235 (Graber, J., concurring in part and dissenting in part) (citing *Billington* v. *Smith*, 292 F. 3d 1177 (CA9 2002)). Under Ninth Circuit law,[4] an entry that otherwise complies with the Fourth Amendment is not rendered unreasonable because it provokes a violent reaction. See *id.,* at 1189–1190.

————————

[4] Our citation to Ninth Circuit cases should not be read to suggest our agreement (or, for that matter, disagreement) with them. The Ninth Circuit's "provocation" rule, for instance, has been sharply questioned elsewhere. See *Livermore* v. *Lubelan*, 476 F. 3d 397, 406–407 (CA6 2007); see also, *e.g., Hector* v. *Watt*, 235 F. 3d 154, 160 (CA3 2001) ("[I]f the officers' use of force was reasonable given the plaintiff's acts, then despite the illegal entry, the plaintiff's own conduct would be an intervening cause"). Whatever their merits, all that matters for our qualified immunity analysis is that they do not clearly establish any right that the officers violated.

Under this rule, qualified immunity necessarily applies here because, as explained above, competent officers could have believed that the second entry was justified under both continuous search and exigent circumstance rationales. Indeed, even if Reynolds and Holder misjudged the situation, Sheehan cannot "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *Id.,* at 1190. Courts must not judge officers with "the 20/20 vision of hindsight.'" *Ibid.* (quoting *Graham*, 490 U. S., at 396).

When *Graham*, *Deorle*, and *Alexander* are viewed together, the central error in the Ninth Circuit's reasoning is apparent. The panel majority concluded that these three cases "would have placed any reasonable, competent officer on notice that it is unreasonable to forcibly enter the home of an armed, mentally ill suspect who had been acting irrationally and had threatened anyone who entered when there was no objective need for immediate entry." 743 F. 3d, at 1229. But even assuming that is true, *no precedent clearly established that there was not "an objective need for immediate entry" here.* No matter how carefully a reasonable officer read *Graham*, *Deorle*, and *Alexander* beforehand, that officer could not know that reopening Sheehan's door to prevent her from escaping or gathering more weapons would violate the Ninth Circuit's test, even if all the disputed facts are viewed in respondent's favor. Without that "fair notice," an officer is entitled to qualified immunity. See, *e.g., Plumhoff*, 572 U. S., at \_\_\_ (slip op., at 13).

Nor does it matter for purposes of qualified immunity that Sheehan's expert, Reiter, testified that the officers did not follow their training. According to Reiter, San Francisco trains its officers when dealing with the mentally ill to "ensure that sufficient resources are brought to the scene," "contain the subject" and "respect the suspect's

"comfort zone," "use time to their advantage," and "employ non-threatening verbal communication and open-ended questions to facilitate the subject's participation in communication." Brief for Respondent 7. Likewise, San Francisco's policy is "'to use hostage negotiators'" when dealing with "'a suspect [who] resists arrest by barricading himself.'" *Id.,* at 8 (quoting San Francisco Police Department General Order 8.02, §II(B) (Aug. 3, 1994), online at http://www.sf-police.org (as visited May 14, 2015, and available in Clerk of Court's case file)).

Even if an officer acts contrary to her training, however, (and here, given the generality of that training, it is not at all clear that Reynolds and Holder did so), that does not itself negate qualified immunity where it would otherwise be warranted. Rather, so long as "a reasonable officer could have believed that his conduct was justified," a plaintiff cannot "avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." *Billington*, *supra,* at 1189. Cf. *Saucier* v. *Katz*, 533 U. S. 194, 216, n. 6 (2001) (GINSBURG, J., concurring in judgment) ("'[I]n close cases, a jury does not automatically get to second-guess these life and death decisions, even though a plaintiff has an expert and a plausible claim that the situation could better have been handled differently'" (quoting *Roy* v. *Inhabitants of Lewiston*, 42 F. 3d 691, 695 (CA1 1994))). Considering the specific situation confronting Reynolds and Holder, they had sufficient reason to believe that their conduct was justified.

Finally, to the extent that a "robust consensus of cases of persuasive authority" could itself clearly establish the federal right respondent alleges, *al-Kidd,* 563 U. S., at ___ (slip op., at 10), no such consensus exists here. If anything, the opposite may be true. See, *e.g., Bates* v. *Chesterfield County*, 216 F. 3d 367, 372 (CA4 2000)

("Knowledge of a person's disability simply cannot fore-close officers from protecting themselves, the disabled person, and the general public"); *Sanders* v. *Minneapolis*, 474 F. 3d 523, 527 (CA8 2007) (following *Bates, supra*); *Menuel* v. *Atlanta*, 25 F. 3d 990 (CA11 1994) (upholding use of deadly force to try to apprehend a mentally ill man who had a knife and was hiding behind a door).

In sum, we hold that qualified immunity applies be-cause these officers had no "fair and clear warning of what the Constitution requires." *al-Kidd, supra*, at \_\_\_ (KENNEDY, J., concurring) (slip op., at 3). Because the qualified immunity analysis is straightforward, we need not decide whether the Constitution was violated by the officers' failure to accommodate Sheehan's illness.

\*    \*    \*

For these reasons, the first question presented is dis-missed as improvidently granted. On the second question, we reverse the judgment of the Ninth Circuit. The case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

No. 13–1412

CITY AND COUNTY OF SAN FRANCISCO,
CALIFORNIA, ET AL., PETITIONERS *v.*
TERESA SHEEHAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[May 18, 2015]

JUSTICE SCALIA, with whom JUSTICE KAGAN joins, concurring in part and dissenting in part.

The first question presented (QP) in the petition for certiorari was "Whether Title II of the Americans with Disabilities Act [(ADA)] requires law enforcement officers to provide accommodations to an armed, violent, and mentally ill suspect in the course of bringing the suspect into custody." Pet. for Cert. i. The petition assured us (quite accurately), and devoted a section of its argument to the point, that "The Circuits Are In Conflict On This Question." *Id.,* at 18. And petitioners faulted the Ninth Circuit for "holding that the ADA's reasonable accommodation requirement applies to officers facing violent circumstances," a conclusion that was "in direct conflict with the categorical prohibition on such claims adopted by the Fifth and Sixth Circuits." *Ibid.* Petitioners had expressly advocated for the Fifth and Sixth Circuits' position in the Court of Appeals. See Appellees' Answering Brief in No. 11–16401 (CA9), pp. 35–37 ("[T]he ADA does not apply to police officers' responses to violent individuals who happen to be mentally ill, where officers have not yet brought the violent situation under control").

Imagine our surprise, then, when the petitioners' principal brief, reply brief, and oral argument had nary a word

to say about that subject. Instead, petitioners bluntly announced in their principal brief that they "do not assert that the actions of individual police officers [in arresting violent and armed disabled persons] are never subject to scrutiny under Title II," and proclaimed that "[t]he only ADA issue here is *what* Title II requires of individual officers who are facing an armed and dangerous suspect." Brief for Petitioners 34 (emphasis added). In other words, the issue is not (as the petition had asserted) *whether* Title II applies to arrests of violent, mentally ill individuals, but rather *how* it applies under the circumstances of this case, where the plaintiff threatened officers with a weapon. We were thus deprived of the opportunity to consider, and settle, a controverted question of law that has divided the Circuits, and were invited instead to decide an ADA question that has relevance only if we assume the Ninth Circuit correctly resolved the antecedent, unargued question on which we granted certiorari. The Court is correct to dismiss the first QP as improvidently granted.

Why, one might ask, would a petitioner take a position on a Circuit split that it had no intention of arguing, or at least was so little keen to argue that it cast the argument aside uninvited? The answer is simple. Petitioners included that issue to induce us to grant certiorari. As the Court rightly observes, there are numerous reasons why we would not have agreed to hear petitioners' first QP if their petition for certiorari presented it in the same form that it was argued on the merits. See *ante,* at 7–10. But it is also true that there was little chance that we would have taken this case to decide only the second, fact-bound QP—that is, whether the individual petitioners are entitled to qualified immunity on respondent's Fourth Amendment claim.

This Court's Rule 10, entitled "Considerations Governing Review on Certiorari," says that certiorari will be granted "only for compelling reasons," which include the

existence of conflicting decisions on issues of law among federal courts of appeals, among state courts of last resort, or between federal courts of appeals and state courts of last resort. The Rule concludes: "A petition for a writ of certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law." The second QP implicates, at most, the latter. It is unlikely that we would have granted certiorari on that question alone.

*But* (and here is what lies beneath the present case) when we do grant certiorari on a question for which there is a "compelling reason" for our review, we often also grant certiorari on attendant questions that are not independently "certworthy," but that are sufficiently connected to the ultimate disposition of the case that the efficient administration of justice supports their consideration. In other words, by promising argument on the Circuit conflict that their first question presented, petitioners got us to grant certiorari not only on the first question but also on the second.

I would not reward such bait-and-switch tactics by proceeding to decide the independently "uncertworthy" second question. And make no mistake about it: Today's judgment is a reward. It gives the individual petitioners all that they seek, and spares San Francisco the significant expense of defending the suit, and satisfying any judgment, against the individual petitioners.* I would not encourage future litigants to seek review premised on arguments they never plan to press, secure in the knowledge that once they find a toehold on this Court's docket, we will consider whatever workaday arguments

─────────

*San Francisco will still be subject to liability under the ADA if the trial court determines that the facts demanded accommodation. The Court of Appeals vacated the District Court's judgment that the ADA was inapplicable to police arrests of violent and armed disabled persons, and remanded for the accommodation determination.

they choose to present in their merits briefs.

There is no injustice in my vote to dismiss both questions as improvidently granted. To be sure, *ex post*—after the Court has improvidently decided the uncertworthy question—it appears that refusal to reverse the judgment below would have left a wrong unrighted. *Ex ante*, however—before we considered and deliberated upon the second QP but after petitioners' principal brief made clear that they would not address the Circuit conflict presented by the first QP—we had no more assurance that this question was decided incorrectly than we do for the thousands of other uncertworthy questions we refuse to hear each Term. *Many* of them have undoubtedly been decided wrongly, but we are not, and for well over a century have not been, a court of error correction. The fair course—the just course—is to treat this now-nakedly uncertworthy question the way we treat all others: by declining to decide it. In fact, there is in this case an even greater reason to decline: to avoid being snookered, and to deter future snookering.

Because I agree with the Court that "certiorari jurisdiction exists to clarify the *law*," *ante*, at 9 (emphasis added), I would dismiss both questions presented as improvidently granted.