EVELEIGH, J., dissenting.
I respectfully dissent. My concurrence in Haynes v. Middletown , 314 Conn. 303, 331, 101 A.3d 249 (2014), notes that "our *380 law surrounding the identifiable person, imminent harm exception to municipal immunity is, to put it mildly, less than clear." The majority opinion in the present case showcases the murkiness of that exception and, therefore, I reiterate that concern today. Moreover, I am also concerned because the constables in the present case, the defendants Robert Powers and Rhea Milardo,[1] appeared to ignore the plight of a person obviously suffering from mental illness and the injuries that could result from that illness if left untreated. Unfortunately, the majority does not consider the condition of the decedent, Elsie White, to constitute a threat of imminent harm and, therefore, does not believe that the defendants, who joked about the incident and may have lied about their availability to a police dispatcher, were under any duty to investigate White's condition. In view of White's psychological state, I disagree. Therefore, I respectfully dissent.
As a preliminary matter, I adopt the reasoning set forth in my concurring opinion in Haynes and apply it to the present case. The test announced by the majority in Haynes regarding imminence was "whether it was apparent to the municipal defendant that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to **278 prevent the harm." Id., at 323, 101 A.3d 249. I responded by concluding that "the majority's solution only throws our jurisprudence regarding this exception into even greater confusion.... In my view, the conclusion adopted by the majority collapses the apparentness and imminent prongs into one, and it does so in a way that only further tangles a doctrine which is already full of snarls." (Citation omitted.) Id., at 336-37, 101 A.3d 249. I suggested that the proper test for determining whether harm was imminent should be "whether it was, or should have been, apparent to the municipal defendant that the dangerous condition was so likely to cause harm in the near future that the defendant had a clear and unequivocal duty to act to prevent the harm. In my view, this test would make it clear that situations such as those presented in [ Shore v. Stonington , 187 Conn. 147, 444 A.2d 1379 (1982) ] and [ Edgerton v. Clinton , 311 Conn. 217, 86 A.3d 437 (2014) ] present issues of fact to be decided by the jury." Haynes v. Middletown , supra, 314 Conn. at 338, 101 A.3d 249. I based this proposed test on precedent from this court and the plain language of General Statutes § 52-557n, which provides in relevant part "a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties ...." Section 52-557n (a) (1) (A) explicitly includes negligence as a standard for whether governmental immunity exists; therefore, it should be incorporated into the identifiable person, imminent harm exception in order to create a cohesive standard. See Haynes v. Middletown , supra, at 338, 101 A.3d 249 (Eveleigh , J. , concurring). In my view, combining a negligence standard with the identifiable person, imminent harm exception would satisfy this legislative mandate and leave many issues regarding governmental immunity for the jury to decide. Id. **279 Due to the disparity between the test established in Haynes and this court's prior precedent, the Appellate Court was *381 placed in a difficult position of trying to reconcile our case law and formulate a coherent and workable test for the imminent harm exception. Ultimately, the Appellate Court concluded that a harm is imminent if it is "more likely than not to occur"; Brooks v. Powers , 165 Conn.App. 44, 71, 138 A.3d 1012 (2016) ; a test which both the majority and I agree is incorrect. The majority, however, continues to use the three-pronged test for the exception; see Edgerton v. Clinton , supra, 311 Conn. at 229, 86 A.3d 437 ; a test which this court's decision in Haynes essentially precludes by collapsing, into a single standard, the test governing the imminence of harm. Haynes v. Middletown , supra, 314 Conn. at 323, 101 A.3d 249. Instead, this court should be examining whether the harm was "so likely" to occur in the "near future" that the municipal defendant should have been aware that he or she had an unequivocal duty to act. Id., at 338, 101 A.3d 249 (Eveleigh , J. , concurring.) This standard provides a framework for determining whether the exception to governmental immunity exists; it is an objective test looking at the totality of the circumstances to determine whether there was such a high degree of certainty that the harm would occur that the municipal defendant should have been aware of the need for his or her intervention.
I would also conclude that the present case should not be decided on a motion for summary judgment. In Edgerton v. Clinton , supra, 311 Conn. at 245, 86 A.3d 437 (Eveleigh , J. , dissenting), I agreed with the majority that "the determination of whether the identifiable person-imminent harm exception to the doctrine of qualified immunity is a matter of law," but, nevertheless, concluded that the court "must make this determination in light of the factual findings of the jury." The same is true in the present case. The majority in Edgerton recognized as **280 much. "Unlike sovereign immunity, which includes immunity from suit and immunity from liability, governmental immunity shields a municipality from liability only.... Immunity from suit on the basis of sovereign immunity implicates subject matter jurisdiction, and, therefore, sovereign immunity issues are resolved prior to trial.... In contrast, because governmental immunity shields a governmental entity from liability rather than litigation to which it does not consent, unresolved factual issues concerning a governmental immunity claim can be decided by a jury." (Citations omitted.) Id., at 227 n.9, 86 A.3d 437.
In Edgerton , this court was able to proceed with its analysis because the case had already gone to trial. Id., at 225, 86 A.3d 437. In the present case, however, there have been no factual findings upon which to base our decision, as the present appeal concerns a motion for summary judgment. The identifiable person, imminent harm exception requires a determination of not only the facts of which the municipal defendant was aware, but also what factors actually were present for that defendant to have considered. See Purzycki v. Fairfield , 244 Conn. 101, 107-108, 708 A.2d 937 (1998), overruled in part on other grounds by Haynes v. Middletown , 314 Conn. 303, 101 A.3d 249 (2014). Additionally, under the test I propose-determining what the officer should have been aware of-requires a factual determination of what a reasonable officer would have known; a determination that should be made by the fact finder after weighing all the evidence. See Hernandez v. Mesa , ---U.S. ----, 137 S.Ct. 2003, 2006-2007, 198 L.Ed.2d 625 (2017). Nevertheless, I examine the present case in the context of our existing case law as established by Haynes and its progeny.
The concept of police officers helping patients with mental illness has been codified *382 in General Statutes § 17a-503 (a), which provides in relevant part: "Any **281 police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section...." The plain language of this statute makes it is apparent that the legislature intends for police officers to be the first line of defense when helping people with mental illness who could be dangerous to themselves or others. Police officers were, in fact, one of the first groups of professionals granted power to involuntarily commit a mentally ill person in the original language of that statute. See General Statutes (Rev. to 1979) § 17-183a. This statutory language demonstrates the legislature's intention to rely on police officers to perform this duty.[2]
Part of the intent behind § 17a-503 was to give greater power to police officers to help patients without having to bring criminal charges. Number 77-595 of the 1977 Public Acts (P.A. 77-595), which first enacted this provision, was referred to by Representative Virginia Connolly as "a mental health patient's bill of rights because [the patient] is protected from the mental health standpoint and from the legal standpoint." 20 H.R. Proc., Pt. 14, 1977 Sess., p. 5787. Part of this legislation was intended to give greater clarity to police officers who tried to help patients with mental illness. Before the enactment of P.A. 77-595 police had to arrest people who are mentally ill in order to get them treatment, which police were hesitant to do, leaving many without the help they needed. See Conn. Joint Standing Committee **282 Hearings, Judiciary, Pt. 1, 1977 Sess., p. 196-97. The portion of the act concerning police powers was primarily focused on encouraging officers to help people with mental illness rather than arrest them. "The second question, is the question of police officer discretion, we've introduced provisions ... to allow police officers to take people to the emergency room to be evaluated within [twenty-four] hours, to see if they need hospitalization. In the past and currently often police officers will feel the need to file charges [against] someone to justify the detention, where no charges needed to be filed given the nature of the case. If we make it express that the police officers can initiate an emergency evaluation then perhaps we will reduce the number of criminal charges that have to be processed by the criminal system and also, reduce the number of instances [when] people have had charges filed [against them when] it wasn't necessary." Id., p. 200, remarks of Attorney Lance Crane.
Connecticut precedent has recognized the importance of police involvement in mental health issues as well. In Rockville General Hospital v. Mercier , Superior Court, judicial district of Tolland, Docket No. CV-90-44838-S (November 9, 1992) (7 Conn. L. Rptr. 558, 1992 WL 335218), Judge Lawrence Klaczak commented on the state's interest in the welfare of citizens regarding their mental health. "In appropriate circumstances, the right of an individual to refuse medical treatment is subject to being overridden by state interests, including preservation of life, protection of interests of innocent third persons, prevention of suicide, and maintenance of *383 the ethical integrity of the medical profession." Id., at 558-59. Attorney General Clarine Riddle also commented on the necessity of police intervention with patients who are disabled or a danger to themselves or others. "[O]nly patients admitted on written application may be subject to involuntary confinement either for up to five days **283 after giving notice of a desire to leave, or up to fifteen days after notice is given if an application for confinement is filed with the [P]robate [C]ourt.... During this period, rehospitalization provisions of [General Statutes (Rev. to 1989) § 17-198] would apply and the state or local police would be required to assist in such rehospitalization at the request of authorities." (Citation omitted; emphasis added; internal quotation marks omitted.) Opinions, Conn. Atty. Gen., No. 89-006 (March 3, 1989), p. 6. Attorney General Riddle also analyzed General Statutes (Rev. to 1989) § 17-183a and, specifically, what information could be used to establish "reasonable cause," observing that "the decision as to whether reasonable cause exists ... is a discretionary function which must be exercised by the police officer."[3] Id., p. 7.
Encouraging police officers to engage in matters that are both welfare and health related is not a new concept, but can be seen as arising from their function as a "community caretak[er]," as identified by the United States Supreme Court in Cady v. Dombrowski , 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). "Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. In Cady , the community caretaker function was seen as an exception to the search warrant rule for searching vehicles; id., at 447-48, 93 S.Ct. 2523 ; but the concept of a community caretaker has been applied to **284 other exceptions from the warrant rule when searching homes or businesses. Mincey v. Arizona , 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). In Mincey , the United States Supreme Court specifically approved of the "emergency assistance" exception, whereby police officers could legally enter a building to search for a person whom the police officers reasonably believe is in need of aid, or to search the surrounding area of a homicide scene to determine if there are any other victims. Id. In Mincey , the United States Supreme Court explained, "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (Emphasis added; internal quotation marks omitted.) Id.
Although the emergency assistance exception to the search warrant requirement is couched in discretionary language regarding the right to search a premise, the United States Supreme Court recognizes the necessity of protecting and preserving life, and the government's obligation to perform this task. Id. ; see also Brigham City v. Stuart , 547 U.S. 398, 403-404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). The court has extended the caretaking concept to other areas of government functions, even before it was commonly identified as a community caretaking function. See Michigan v. Tyler , 436 U.S. 499, 509-10, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (entry *384 into building to extinguish fire was sufficient exigency to protect people and property); Camara v. Municipal Court of San Francisco , 387 U.S. 523, 538-9, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (performing health inspections in emergency situation is permissible); Jacobson v. Commonwealth of Massachusetts , 197 U.S. 11, 31-32, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (emergency mandatory smallpox vaccination constitutional); **285 Compagnie Francaise de Navigation a Vapeur v. Board of Health , 186 U.S. 380, 391-92, 22 S.Ct. 811, 46 L.Ed. 1209 (1902) (states are permitted to detain citizens in mandatory quarantine under emergency situations).
Recently, the United States Supreme Court has recognized the emergency assistance exception for police aid to a mentally ill person. In San Francisco v. Sheehan , --- U.S. ----, 135 S.Ct. 1765, 1769-70, 191 L.Ed.2d 856 (2015), police responded to a group home where a patient diagnosed with a schizoaffective disorder had threatened staff, was no longer taking her medication, no longer spoke with her psychiatrist, and was not changing her clothes or eating. When police arrived they attempted to make entry into the patient's room, only to be threatened with a knife. Id., at 1770. They retreated and closed the door, but, realizing that this could be a tactical error and possibly lead to the patient harming herself, the police officers chose to make entry again rather than wait for backup. Id., at 1770-71. After the police were threatened with the knife again, and the patient did not respond to pepper spray, the patient was shot several times. Id., at 1771.
The patient commenced an action claiming that the officers had violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., by not subduing her in a way to accommodate her disability and also sought to recover for violation of her rights under the fourth amendment to the United States Constitution pursuant to 42 U.S.C. § 1983. Id. The United States Supreme Court determined that, in reference to the fourth amendment claim, the entry into the patient's room was permissible under the emergency assistance exception to the search warrant rule. Id., at 1774-75. The use of force was also permissible, as the police officers continued to escalate their use of force in an attempt to subdue the patient, only using lethal force when other options failed. Id., at 1775, 191 L.Ed.2d 856. Both the original entry into the room and the second entry were found reasonable **286 in the circumstances, considering the patient's deteriorating mental state. Id., at 1777-78.
Although most of the foregoing cases are examples of search and seizure jurisprudence, the policy rationale that underlies them all carries weight in the present case; courts seek to protect officers who engage in activities to protect the general public, regardless of whether they may have "made 'some mistakes.' " Id., at 1775 ; see also Heien v. North Carolina , ---U.S. ----, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014). This is the exact same reasoning behind governmental immunity. " General Statutes § 52-557n abandons the common-law principle of municipal sovereign immunity and establishes the circumstances in which a municipality may be liable for damages.... One such circumstance is a negligent act or omission of a municipal officer acting within the scope of his or her employment or official duties.... [Section] 52-557n (a) (2) (B), however, explicitly shields a municipality from liability for damages to person or property caused by the negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.
*385 "Municipal officials are immune from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society.... Discretionary act immunity reflects a value judgment that-despite injury to a member of the public-the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury.... In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial **287 acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion." (Citations omitted; footnotes omitted; internal quotation marks omitted.) Doe v. Petersen , 279 Conn. 607, 614-15, 903 A.2d 191 (2006).
"The immunity from liability for the performance of discretionary acts by a municipal employee is subject to three exceptions or circumstances under which liability may attach even though the act was discretionary: first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm; see, e.g., Sestito v. Groton , 178 Conn. 520, 528, 423 A.2d 165 (1979) ; second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws; see, e.g., General Statutes § 7-108 [creating municipal liability for damage done by mobs]; and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence. See, e.g., Stiebitz v. Mahoney , 144 Conn. 443, 448-49, 134 A.2d 71 (1957)." Evon v. Andrews , 211 Conn. 501, 505, 559 A.2d 1131 (1989).
In the present case, the plaintiff, Bernadine Brooks, the administratrix of White's estate, challenges the trial court's award of summary judgment in favor of the defendants. Given that procedural posture, it is axiomatic that this court must interpret the facts in favor of the nonmoving party-namely, the plaintiff. St. Pierre v. Plainfield , 326 Conn. 420, 426, 165 A.3d 148 (2017). The defendants were working as a marine patrol, but were unable to do so due to the severe storms in the area. Brooks v. Powers , supra, 165 Conn.App. at 48, 138 A.3d 1012. Instead, they chose to perform a patrol on land and, on one occasion, responded to an emergency call regarding an infant who was choking. Id., at 48-51, 138 A.3d 1012. After reporting for their scheduled shift, they drove to a local store where they encountered a tax collector employed **288 by the town of Westbrook, who informed Powers that there was a woman "wearing a shirt and pants, without a coat or any other rain gear, and was standing with her hands raised to the sky." Id., at 49, 138 A.3d 1012. There appears to have been some debate between the parties as to whether the tax collector told Powers that the woman "needs" help or "might need" help but, regardless, it is undisputed that the tax collector sought help; she relayed information to Powers indicating that there was a woman outside without proper outerwear that was acting very strangely considering the severe storm. In my view, the differences in the interpretation of what the tax collector actually said would create a material issue of fact for the jury on the question of imminent harm. Powers' account of these events is subject to even further scrutiny in view of the possible prevarications to the dispatcher regarding the defendants' ability to travel; specifically, the statement that they could not leave the boat, when in fact, they already had left. *386 Rather than respond to the woman wearing improper clothing and acting strangely in the middle of an open field during an intense storm, Powers chose to place a telephone call to the dispatcher to report the situation. Id. Instead of giving a proper report, however, Powers proceeded to laugh and then claimed that, because he could not leave the boat, another officer would need to be sent.[4] Id., at 50 and n.3, 138 A.3d 1012. The dispatcher did not send anyone to check on the woman, claiming that she " 'forgot.' " Id., at 50, 138 A.3d 1012. Whether her doing so was a product of Powers trivializing the situation presents a separate question of fact, which should have been left for the jury. The defendants eventually drove by the field where White was last seen, but when they arrived they did not see anyone and drove away without even getting **289 out of their car. Id., at 51, 138 A.3d 1012. The next day, White's body was found among some rocks near the shore less than a mile from where the tax collector had reported seeing her. Id., at 52, 138 A.3d 1012.
It is important to note that this was not a circumstance where officers needed to make "split second, discretionary decisions on the basis of limited information." Edgerton v. Clinton , supra, 311 Conn. at 228 n.10, 86 A.3d 437. The defendants had all available information before making a decision regarding how to respond, and there were no immediate time constraints placed upon them other than the general urgency created by a person in need. Unlike affirmative actions taken to help people where a mistake is made; see, e.g., Heien v. North Carolina , supra, 135 S.Ct. at 536 ; the defendants in the present case took no action to help White. The defendants emphasize that they did take action by calling dispatch, but this same action-calling a dispatcher but not taking any additional steps-is the same behavior that this court did not reference as sufficient in Sestito v. Groton , supra, 178 Conn. at 523, 423 A.2d 165. In Sestito , one of the defendants, a police officer in the city of Groton, witnessed a large fight outside of a local bar. Id., at 522-23, 423 A.2d 165. He continued watching the group fight, and when he heard gunshots, he called the police station but did not receive any instructions. Id., at 523, 423 A.2d 165. When the decedent was shot, he then drove over and arrested the attacker. Id. Although § 52-557n was not in existence at that time, the concept that proceeded it-namely, the distinction between public and private duties-was in force and provided a background for the policy reasons underlying governmental immunity and exceptions. See, e.g., Shore v. Stonington , supra, 187 Conn. at 152-53, 444 A.2d 1379. This court determined that the matter of whether the officer in Sestito could be liable was a question for the jury to decide and, rather than foreclose recovery altogether, implicitly **290 concluded that the telephone call was insufficient to relieve him of liability. Sestito v. Groton , supra, at 528, 423 A.2d 165.
The application of the identifiable victim, imminent harm exception to governmental immunity should be guided by the exception's purpose: identifying a specific category of cases where "the policy rationale underlying discretionary act immunity-to encourage municipal officers to exercise judgment-has no force." Doe v. Petersen , supra, 279 Conn. at 615, 903 A.2d 191. The fact that the harm in the present case happened in an unexpected way should not be relevant as long as the standard rules of foreseeability bring it within the scope *387 of the danger that was imminent and, therefore, against which the defendants had a duty to guard. The reason for this is that the scope of the harm is unrelated to the need for immediate action. If a danger was slight, but the victim by chance was injured anyway, then the exception would not apply. If, however, the danger was great and the victim was injured by a foreseeable event that was within the scope of that danger, then there is no public policy reason to bar recovery. If there is an apparent imminent harm, the officer has a duty to act. A jury could find that there was such harm in the present case. The defendants' duty to act arose not from the specific way in which harm might befall White. That duty arose from the fact that White was in grave danger, or so a jury could find. The level of generality at which the danger is defined is simply a product of the nature of the danger. For example, the foreseeable danger of an icy walkway is probably limited to injuries from slipping. See, e.g., Burns v. Board of Education , 228 Conn. 640, 642, 638 A.2d 1 (1994), overruled in part on other grounds by Haynes v. Middletown , 314 Conn. 303, 101 A.3d 249 (2014). The danger of a boisterous, out of control party where there is fighting and a gunshot certainly includes a shooting but would also include, in my view, other forms of physical injury, such as a **291 broken jaw, that could have been found to be imminent in light of the circumstances presented. See, e.g., Sestito v. Groton , supra, 178 Conn. at 523, 423 A.2d 165. The facts at issue in the present case, in my view, are is not too attenuated; a jury could reasonably find that a woman who appears to be delusional and suffering from mental illness, who is out walking in the middle of an intense storm, may harm herself by walking off a cliff, falling, or stepping in front of a car. A jury could find that the information given to Powers-that White was improperly clothed and standing in the middle of the field during a severe storm-demonstrated that she was unable to appreciate risks appropriately.
There is no public policy reason to confer immunity on the defendants in this situation. The obviousness of the danger and the need to act triggers the duty that underlies the exception. It would be reasonable for a jury to find that Powers recognized this danger because he called the dispatcher, but avoided the duty that danger created by lying. While there is not an exception to discretionary act immunity for lying, the fact that Powers may have lied regarding the defendants' ability to travel remains relevant because of its evidentiary value. In light of Powers' response, a jury could infer that he knew that he had a duty to drive the short distance to the field where White had been seen. At that point, his discretion was irrelevant because he had already concluded that he should respond. A jury could certainly find that such a conclusion was, in fact, compelled by the immediately apparent existence of an identifiable victim in imminent danger. Such a finding is made much easier because, in the present case, Powers himself appreciated the fact that he should go to search for the woman seen by the tax collector. In light of these facts, a jury could have reasonably concluded that, because Powers just didn't want to go, he lied and said that he couldn't. Where there is lying to get out of **292 a recognized duty, any exercise of discretion involved is certainly not one the law should have any interest in encouraging.
The defendants observe that the method of informing the dispatcher-a joking telephone call-was not enough to make it "apparent to the municipal defendant that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm."
*388 Haynes v. Middletown , supra, 314 Conn. at 323, 101 A.3d 249. I disagree, however, that a telephone call with joking laughter, rather than using the police radio so others could learn of the situation, could be interpreted as a serious effort to obtain help for White.[5] Indeed, the only inference I could possibly draw from the defendants' actions was that they did not take the call seriously and sought actively to pass the buck. They should have been aware that their flippant method of notifying the dispatcher could prevent White from receiving the help she needed. It is extremely doubtful that the defendants would have taken the same attitude if the tax collector had reported a person bleeding along the side of the road.
The majority also contends that the harm could not be "immediate" because White ultimately died less than a mile from the field where she was seen, died sometime after being seen by the tax collector, and died of drowning **293 and not directly from the storm. The problem with this reasoning, however, is that the majority assumes that the dangerous condition confronting White was the storm. The storm, however, was only one factor that should have weighed toward the defendants' decision to respond; the real danger that White faced was her own disregard for her safety, which evinced a reasonable likelihood that she was suffering from mental illness. As stated previously in this dissenting opinion, officers are imbued with the power to help such people through General Statutes § 17a-503. Instead of investigating and determining whether White needed help, the defendants instead chose to ignore their duty.
A determination of whether the harm in the present case is immediate necessarily involves a determination of whether that harm was apparent to the defendants. Haynes v. Middletown , 314 Conn. at 336, 101 A.3d 249. Although I have commented previously in this dissenting opinion about the need to present evidence to the fact finder regarding this element, I think that a report of conduct consistent with mental illness, such as the one at issue in the present case, clearly creates an apparent risk that someone is in danger of being hurt. The majority believes that the actual harm which White incurred, that of drowning, is not one that the defendants could have been aware of from the information which they received. The defendants had information, however, which should have made it apparent that White was in peril of immediate harm from herself . Perhaps she fell into the water or wandered in. The only information apparent to the defendants at the time was that she was acting strangely, improperly dressed, in the middle of a field during a thunderstorm; facts which everyone can agree are inherently dangerous. The risk is not that White could be hurt by the storm but, rather, that she could be trying to hurt herself. That is the danger involved. That danger was reported to the defendants **294 and was made apparent to them, but the defendants chose to ignore it. Indeed, the only *389 person who witnessed White that evening believed that she was in need of medical attention.
Accordingly, I would affirm the judgment of the Appellate Court. Therefore, for the reasons stated, I respectfully dissent.

I note that the town of Westbrook is also a defendant in the present action. For the sake of consistency with the majority opinion, however, I refer to Powers and Milardo as the defendants.

In its present form, § 17a-503 also allows psychologists and clinical social workers, to involuntarily hospitalize a mentally ill person. See General Statutes § 17a-503 (c) and (d). Psychologists were included in No. 93-227 of the 1993 Public Acts, and nurses and social workers were added in No. 00-147 of the 2000 Public Acts.

Although this could be interpreted to mean that police have unlimited discretion when responding to calls involving mental illness, it is important to recognize that Attorney General Riddle is referring not to the response, but the determination of whether reasonable cause exists to hospitalize a person.

Not only could the officers leave the boat, they were actually gone from the boat when all these events occurred. Brooks v. Powers , supra, 165 Conn.App. at 49-50, 138 A.3d 1012.

The amicus brief filed by, inter alia, the Connecticut Conference of Municipalities vehemently opposes this interpretation of the officer's actions, stating "humour [is] a key component of the working relationship between police officers and ambulance staff." S. Charman, "Sharing a Laugh: The Role of Humour in Relationships between Police Officers and Ambulance Staff," 33 International J. of Soc. & Soc. Policy 152, 162 (2013). No doubt, humor is a necessary defense mechanism to help guard police and emergency responders from the horrors they witness; however, when that humor interferes with the ability to properly respond to another's need and becomes an emergency responders chosen response rather than to help, then the line may been crossed from humor into negligence. At the very least that question should be resolved by a jury.