Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/22/2017 08:11 PM CST

MARILYN WALDRON, APPELLANT, V. LANCASTER COUNTY
DEPUTY SHERIFF JAMES ROARK, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY, APPELLEE.

___ N.W.2d ___

Filed October 13, 2017.    No. S-16-676.

1. **Summary Judgment: Appeal and Error.** An appellate court reviews
   the district court's grant of summary judgment de novo, viewing the
   record in the light most favorable to the nonmoving party and drawing
   all reasonable inferences in that party's favor.
2. **Summary Judgment: Immunity.** When a defendant asserts qualified
   immunity at the summary judgment stage, the plaintiff must produce
   evidence sufficient to create a genuine issue of fact regarding whether
   the defendant violated clearly established law.
3. **Summary Judgment.** Summary judgment is proper when the pleadings
   and evidence admitted at the hearing disclose no genuine issue regard-
   ing any material fact or the ultimate inferences that may be drawn from
   those facts and that the moving party is entitled to judgment as a matter
   of law.
4. ____. In the summary judgment context, a fact is material only if it
   would affect the outcome of the case. If a genuine issue of material fact
   exists, summary judgment may not properly be entered.
5. **Immunity.** Those entitled to qualified immunity hold more than a mere
   defense to liability; they hold an entitlement not to stand trial or face the
   other burdens of litigation.
6. ____. If a case is erroneously permitted to go to trial, then qualified
   immunity is effectively lost.
7. **Immunity: Public Officers and Employees.** Qualified immunity
   shields federal and state officials from money damages unless a plaintiff
   pleads facts showing (1) that the official violated a statutory or consti-
   tutional right and (2) that the right was clearly established at the time of
   the challenged conduct.
8. ____: ____. In evaluating whether the right to qualified immunity
   was clearly established, the question is not whether the very action in

question has previously been held unlawful, but whether the contours of the right were sufficiently clear at the time of the challenged conduct that every reasonable official would have understood that the challenged conduct violates that right.

9. **Immunity.** In a qualified immunity analysis, the dispositive question is whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

10. **Immunity: Public Officers and Employees.** The clearly established standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.

11. ____: ____. Even if a public official has engaged in unlawful conduct, the clearly established prong of the qualified immunity analysis protects him or her from suit so long as the official reasonably believed such conduct to be lawful.

12. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure.** Under certain circumstances, an officer's unannounced entry into a home might be unreasonable under the Fourth Amendment.

13. ____: ____: ____. The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests.

14. **Police Officers and Sheriffs: Search and Seizure: Words and Phrases.** In order to justify a no-knock entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile or that it would inhibit the effective investigation of the crime, for example by allowing the destruction of evidence.

15. **Police Officers and Sheriffs: Search and Seizure.** Police must have a reasonable suspicion under the particular circumstances that one of the grounds for failing to knock and announce exists, and this showing is not high.

16. **Immunity.** Courts have discretion to decide which of the two prongs of qualified immunity analysis to tackle first.

17. **Immunity: Police Officers and Sheriffs.** The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his or her conduct was unlawful in the situation he or she confronted.

18. **Police Officers and Sheriffs: Arrests: Words and Phrases.** Reasonable force, which may be used by an officer making an arrest, is generally considered to be that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would deem necessary under the circumstances.

19. **Police Officers and Sheriffs: Arrests.** The inquiry into the reasonableness of a use of force assesses reasonableness at the moment of the use of force, as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

20. **Constitutional Law: Civil Rights: Municipal Corporations.** Municipalities can be sued directly under 42 U.S.C. § 1983 (2012) for monetary, declaratory, or injunctive relief where the action alleged to be unconstitutional implements or executes a policy statement or custom of the municipality.

21. **Civil Rights: Municipal Corporations: Employer and Employee: Liability.** A municipality cannot be held liable under 42 U.S.C. § 1983 (2012) on a respondeat superior theory.

22. **Civil Rights: Public Officers and Employees.** The government as an entity is responsible under 42 U.S.C. § 1983 (2012), when execution of its policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.

23. **Summary Judgment.** Conclusions based upon guess, speculation, conjecture, or a choice of possibilities do not create material issues of fact for purposes of summary judgment.

24. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

Appeal from the District Court for Lancaster County: Robert R. Otte, Judge. Affirmed.

Vincent M. Powers, of Vincent M. Powers and Associates, for appellant.

Joe Kelly, Lancaster County Attorney, David A. Derbin and Ryan M. Swaroff for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Per Curiam.

## I. INTRODUCTION

Marilyn Waldron brought this action pursuant to 42 U.S.C. § 1983 (2012), alleging a violation of her Fourth Amendment rights by Lancaster County Deputy Sheriff James Roark when

he entered Waldron's home to serve a warrant on Waldron's grandson, Steven Copple. Waldron argues that in doing so, Roark violated the knock-and-announce rule. Waldron also argues that her arrest was unreasonable and unconstitutional because there was no probable cause to arrest her and because Roark used excessive force in handcuffing her.

In *Waldron v. Roark* (*Waldron I*),[1] we found that material issues of fact existed as to Waldron's knock-and-announce and excessive force claims and remanded the cause. On remand, following additional argument on the issues of qualified immunity and sovereign immunity, the district court again granted Roark's motion for summary judgment, on the basis that Roark was entitled to qualified immunity. In this appeal, we now analyze Waldron's claims within the framework of the affirmative defense of qualified immunity. Because we find that Waldron did not meet the burden of showing that Roark violated a clearly established right in any of Waldron's claims, we affirm the district court's grant of qualified immunity.

## II. BACKGROUND

In September 2013, Waldron filed a complaint against Roark, alleging that Roark violated Waldron's civil rights under § 1983, resulting in her injuries. Forming the basis of this action are the events that happened on February 22, 2012, when Roark and his partner, Lancaster County Deputy Sheriff Amanda May, went to Waldron's home to serve an arrest warrant on Copple. The specific allegations regarding what happened during this event are set forth in more detail in *Waldron I* and are discussed further in the analysis section below.

In November 2014, Roark filed a motion for summary judgment. In December 2014, Waldron filed an amended complaint against Roark, in his individual and official capacities. The district court eventually granted the motion for summary judgment, finding as a matter of law that the deputies' entry

---

[1] *Waldron v. Roark*, 292 Neb. 889, 874 N.W.2d 850 (2016).

into Waldron's home was proper, that Waldron obstructed the work of the deputies, and that Roark's use of force was objectively reasonable.

On appeal in *Waldron I*, we reversed the district court's order and remanded the cause for further proceedings. We held that summary judgment on Waldron's § 1983 Fourth Amendment claim was not proper because there were issues of material fact as to (1) whether Roark properly displayed notice of his office or authority when he entered Waldron's home, (2) whether Roark's entry was reasonable, and (3) whether the force Roark used was excessive.

Following the issuance of our opinion in *Waldron I*, the parties again addressed Roark's motion for summary judgment. In its second order granting the motion, the district court found that Roark was entitled to qualified immunity and that the record was sufficiently developed to render a separate trial or evidentiary hearing unnecessary. The court specifically found that (1) Roark was entitled to qualified immunity on Waldron's knock-and-announce claim because sufficient exigent circumstances existed from Roark's perspective to warrant his entry without a proper announcement, (2) Roark was entitled to qualified immunity on the excessive force claim because (a) Roark had probable cause to arrest Waldron and (b) Waldron's right to be free of excessive force was not clearly established, and (3) Roark was entitled to judgment in his favor as to Waldron's claims against him in his official capacity. Waldron appeals.

## III. ASSIGNMENTS OF ERROR

Waldron assigns, restated and consolidated, that the district court erred in finding that (1) Roark was entitled to qualified immunity on Waldron's knock-and-announce claim, (2) Roark was entitled to qualified immunity on Waldron's unlawful arrest claim because (a) Roark had probable cause to arrest Waldron and (b) Waldron's "right to be free of the excessive force used by . . . Roark was not clearly established," (3) there was no evidence to support Waldron's claim that a policy or custom

of Lancaster County caused her damages, and (4) Roark was entitled to summary judgment in his official capacity.

## IV. STANDARD OF REVIEW

[1,2] We review the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[2] When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated clearly established law.[3]

## V. ANALYSIS

[3,4] Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[4] In the summary judgment context, a fact is material only if it would affect the outcome of the case.[5] If a genuine issue of material fact exists, summary judgment may not properly be entered.[6]

### 1. QUALIFIED IMMUNITY

[5,6] Both the U.S. Supreme Court and the Eighth Circuit Court of Appeals have repeatedly "'"stressed the importance of resolving immunity questions at the earliest possible stage in litigation."'"[7] This is because those entitled to qualified

---

[2] *Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. 2011).

[3] *Id.*

[4] *Thomas v. Board of Trustees*, 296 Neb. 726, 895 N.W.2d 692 (2017).

[5] *O'Brien v. Bellevue Public Schools*, 289 Neb. 637, 856 N.W.2d 731 (2014).

[6] *Id.*

[7] *O'Neil v. City of Iowa City, Iowa*, 496 F.3d 915, 917 (8th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). Accord *Hunter v. Bryant*, 502 U.S. 224, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (per curiam).

immunity hold more than a mere defense to liability; they "hold 'an entitlement not to stand trial or face the other burdens of litigation.'"[8] If a case is erroneously permitted to go to trial, then qualified immunity is effectively lost.[9]

[7-11] Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right and (2) that the right was "'clearly established' at the time of the challenged conduct."[10] In evaluating whether the right was "clearly established," the question is not whether the very action in question has previously been held unlawful, but whether "'[t]he contours of [the] right [were] sufficiently clear'" at the time of the challenged conduct that "every 'reasonable official would [have understood] that [the challenged conduct] violates that right.'"[11] A case does not need to be directly on point, but existing precedent must have placed the constitutional question beyond debate.[12] The dispositive question is "whether the violative nature of *particular* conduct is clearly established."[13] This inquiry "'"must be undertaken in light of the specific context of the case, not as a broad general proposition."'"[14] Put frankly, plaintiffs in a § 1983 action have a steep burden of showing that a right is clearly established.[15] The "'clearly established'" standard "'gives government officials breathing room to make reasonable but mistaken

---

[8] *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)).

[9] *Id.*

[10] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011).

[11] *Id.* at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).

[12] *Ashcroft v. al-Kidd, supra* note 10.

[13] *Id.*, 563 U.S. at 742 (emphasis supplied).

[14] *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015).

[15] See *Williams v. Baird*, 273 Neb. 977, 735 N.W.2d 383 (2007).

judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'"[16] Even if a public official has engaged in unlawful conduct, the clearly established prong of the qualified immunity analysis protects him or her from suit so long as the official reasonably believed such conduct to be lawful.[17] If a reasonable official could have believed the conduct was lawful, the official's conduct does not violate clearly established law.[18]

First, we address whether Roark is entitled to qualified immunity on Waldron's knock-and-announce claim.

### (a) Waldron's Knock-and-Announce Claim

[12] The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."[19] Among the factors to be considered in assessing the reasonableness of a search or seizure is the "method of an officer's entry into a dwelling."[20] Under certain circumstances, "an officer's unannounced entry into a home might be unreasonable under the Fourth Amendment."[21] The rule that officers should knock and announce their purpose and be denied admittance prior to entering a dwelling has been codified in Neb. Rev. Stat. § 29-411 (Reissue 2016).[22]

[13] The U.S. Supreme Court has made clear that not every entry must be preceded by an announcement.[23] "The Fourth Amendment's flexible requirement of reasonableness should

---

[16] *City and County of San Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1774, 191 L. Ed. 2d 856 (2015).

[17] See *Anderson v. Creighton, supra* note 11.

[18] *Id.*

[19] U.S. Const. amend. IV.

[20] *Wilson v. Arkansas*, 514 U.S. 927, 934, 115 S. Ct. 1914, 131 L. Ed. 2d 976 (1995).

[21] *Id.*

[22] *State v. Kelley*, 265 Neb. 563, 658 N.W.2d 279 (2003).

[23] *Wilson v. Arkansas, supra* note 20.

not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests."[24] "[I]f circumstances support a reasonable suspicion of exigency when the officers arrive at the door, they may go straight in."[25]

We view the evidence surrounding Roark's entry into Waldron's home in the light most favorable to Waldron. According to Waldron, she "cautiously opened the door" and immediately noticed that "people were pushing on it." Waldron claims that she tried to, but could not, hold the door closed. According to Waldron, it was only "after they got in[to]" Waldron's home that Roark announced that he and his partner, May, were deputies and that they were looking for Copple. Viewing the evidence in the light most favorable to Waldron, we assume that Roark entered Waldron's home without knocking and announcing his purpose.

[14,15] In order to justify a "'no-knock'" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile or that it would inhibit the effective investigation of the crime, for example by allowing the destruction of evidence.[26] "[The Court] require[s] only that police 'have a reasonable suspicion . . . under the particular circumstances' that one of these grounds for failing to knock and announce exists, and . . . '[t]his showing is not high.'"[27]

As we noted in *Waldron I*, one possible exigency in this case was that "Copple posed a threat to the safety of the deputies or the public."[28] Roark testified that as he approached Waldron's home, he saw Copple inside, but that when he reached the

---

[24] *Id.*, 514 U.S. at 934.

[25] *United States v. Banks*, 540 U.S. 31, 37, 124 S. Ct. 521, 157 L. Ed. 2d 343 (2003).

[26] *Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S. Ct. 1416, 137 L. Ed. 2d 615 (1997).

[27] *Hudson v. Michigan*, 547 U.S. 586, 590, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006).

[28] *Waldron I, supra* note 1, 292 Neb. at 904, 874 N.W.2d at 863.

door, he could no longer see Copple. Roark testified that Copple could be "a dangerous guy" and that he was "aware [Copple] had lots of law enforcement contacts," including "prior . . . weapons offenses."

Despite Roark's undisputed testimony about Copple's prior weapons offenses, we found in *Waldron I* that there was a material issue of fact as to whether exigent circumstances existed in his attempt to arrest Copple. However, whether exigent circumstances actually existed to justify Roark's no-knock entry is relevant only to the first prong of the qualified immunity analysis, i.e., whether a statutory or constitutional right has been violated.

[16] The U.S. Supreme Court has repeatedly held that "courts have discretion to decide which of the two prongs of qualified immunity analysis to tackle first."[29] Therefore, in evaluating whether Roark is entitled to qualified immunity against Waldron's knock-and-announce claim, we exercise our discretion to bypass the first prong of the qualified immunity analysis and instead tackle the second prong first. In so doing, we find that regardless of whether exigent circumstances actually existed to justify Roark's no-knock entry into Waldron's home, Roark is entitled to qualified immunity against Waldron's knock-and-announce claim, because a reasonable official could have believed that Roark's no-knock entry was lawful.

As noted above, Waldron bears the steep burden of proving that her right was so clearly established that every reasonable public official would have known that Roark's conduct violated the right. She has not met this burden. Instead, Waldron simply argues that "[i]t has long been held . . . that law enforcement must 'knock and announce' prior to serving a warrant or [when] authorized to make an arrest without [a warrant]."[30] Though it is true that the knock-and-announce

---

[29] *Ashcroft v. al-Kidd, supra* note 10, 563 U.S. at 735 (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).

[30] Brief for appellant at 20.

rule is well established, Waldron ignores the fact that this rule does not apply when exigent or countervailing circumstances exist, and she makes no attempt to delineate the contours of the "exigent circumstances exception."[31]

In addition, Waldron relies solely on *U.S. v. Lucht*[32] to support her assertion that the right at issue was clearly established. While we cited *Lucht* to provide guidance as to whether exigent circumstances existed in *Waldron I*, as noted above, that was a first-prong analysis. We note that the applicability of *Lucht* is limited in addressing the second prong of the qualified immunity analysis. Unlike the case at hand, *Lucht* was not a § 1983 case; rather, the Eighth Circuit's holding applies to the knock-and-announce requirement as it pertains to the suppression of evidence. Moreover, as the district court stated, "there are factual differences between the officer's knowledge, assumptions, and conduct in *Lucht* and those of [Roark] in this case."

Although we are aware that certain categories of exigent circumstances have emerged (for example, when knocking would be dangerous, futile, or might allow the destruction of evidence[33]), we find no case law that so clearly establishes that any law enforcement officer standing in Roark's shoes would have understood that the circumstances presented were not exigent circumstances.

Even viewing the facts in the light most favorable to Waldron, it would not have been "'entirely unreasonable' for an officer to believe, in the particular circumstances of this case," that exigent circumstances existed.[34] Nor do the facts support a finding that Roark was ""'plainly incompetent'"" or ""'knowingly violate[d] the law.'"[35] Thus, we conclude that

---

[31] *Waldron I, supra* note 1, 292 Neb. at 897, 874 N.W.2d at 859.

[32] *U.S. v. Lucht*, 18 F.3d 541 (8th Cir. 1994).

[33] See *Richards v. Wisconsin, supra* note 26.

[34] *Messerschmidt v. Millender*, 565 U.S. 535, 549, 132 S. Ct. 1235, 182 L. Ed. 2d 47 (2012).

[35] *Id.*, 565 U.S. at 546.

Waldron has not met her burden to prove that her right was clearly established. Nor has she shown that a material issue of fact prevents judgment as a matter of law.[36] As such, Waldron's first assignment of error is without merit.

### (b) Waldron's Claims of Unlawful Arrest

Waldron makes two arguments as to why she believes Roark is not entitled to qualified immunity for Waldron's alleged unlawful arrest. First, Waldron argues that Roark did not have probable cause to arrest her; second, Waldron argues that Roark used excessive force in arresting her. We address these arguments separately below, disposing of both arguments under the second prong of the qualified immunity analysis.

### (i) Probable Cause

We again exercise our discretion to bypass the first prong of the qualified immunity analysis and instead consider the second prong first. In so doing, we find that regardless of whether probable cause existed to justify Waldron's arrest, Roark is entitled to qualified immunity under the second prong because the law is not so clearly established that every reasonable official standing in Roark's shoes would have believed that there was no probable cause.

Waldron argues that her arrest was unlawful because Roark did not have a warrant or probable cause to arrest her. On the other hand, Roark argues that he had probable cause to believe that Waldron violated or was violating Neb. Rev. Stat. § 28-901 (Reissue 2016) (obstructing government operations). As noted above, the text of the Fourth Amendment protects "'against unreasonable searches and seizures.'"[37] Subsequent case law establishes that a warrantless seizure of a person is reasonable under the Fourth Amendment where there is probable cause to

---

[36] See *Brock v. Dunning*, 288 Neb. 909, 854 N.W.2d 275 (2014).

[37] *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004).

believe that the person has committed or is committing a criminal offense.[38]

Section 28-901(1) provides, in relevant part, that "[a] person commits the offense of obstructing government operations if he intentionally obstructs, impairs, or perverts the administration of law or other governmental functions by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act . . . ."

Accordingly, the crime of obstructing government operations has two elements. The person must have (1) "obstruct[ed], impair[ed], or pervert[ed] the administration of law or other governmental functions" and (2) intended to do so.[39] On appeal, Waldron does not challenge the district court's finding that "[she] was obstructing and hindering the deputies in the commission of their duties." Instead, Waldron asserts that "she could not have intended to impede" a police investigation because she did not know that Roark and May were law enforcement officers.[40]

Rather than impeding a police investigation, Waldron claims her intent was to "protect [Copple] from what she thought were intruders."[41] Although Waldron's actual intent may be relevant for purposes of determining her mens rea and whether she *actually* violated § 28-901, it is not relevant in considering whether Roark is entitled to qualified immunity. Instead, the relevant question for purposes of our second-prong analysis is whether the law is so clearly established that a reasonable officer standing in Roark's shoes could not have believed that Waldron intended to impede a police investigation.[42]

Though Waldron attempts to establish that Roark violated a statutory or constitutional right, she makes no argument as

---

[38] *Devenpeck v. Alford, supra* note 37.

[39] See § 28-901(1).

[40] Brief for appellant at 15.

[41] *Id.*

[42] See *Ashcroft v. al-Kidd, supra* note 10.

to whether the right was clearly established at the time of the challenged conduct. We acknowledge that "[t]hat one cannot be arrested in the absence of probable cause" is clearly established.[43] But the U.S. Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality. . . . The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."[44] Rather, for a court to find that a violation of clearly established law has occurred, a "more particularized" inquiry is required.[45]

Therefore, as noted above, if a reasonable official could have believed the conduct under the particular circumstances was lawful because there was no existing precedent that had "placed the . . . constitutional question beyond debate," the official's conduct does not violate clearly established law.[46] Here, even viewing the evidence in the light most favorable to Waldron, including her admission that she was obstructing and hindering the deputies in the commission of their duties, a reasonable officer could have believed Waldron's arrest was lawful. We make this finding because the facts were such that Roark could have believed that Waldron knew he and May were law enforcement officers. After all, Roark was acting pursuant to an arrest warrant and Waldron admits that Roark told her that they were law enforcement officers looking for Copple after they entered her residence.

We recognize that there is a factual dispute as to whether Roark showed his badge to Waldron. Waldron testified that Roark announced he was a deputy but refused to show his badge. In contrast, Roark testified that upon entering Waldron's home, he "verbally and physically" identified himself "with

---

[43] *Williams v. Baird, supra* note 15, 273 Neb. at 987, 735 N.W.2d at 392.

[44] *Ashcroft v. al-Kidd, supra* note 10, 563 U.S. at 742 (citations omitted).

[45] *Anderson v. Creighton, supra* note 11, 483 U.S. at 640.

[46] *Ashcroft v. al-Kidd, supra* note 10, 563 U.S. at 741.

[his] badge," and May testified that when she entered the living room, she saw Roark "already had [his badge] out" and "was showing it" to Waldron. But we conclude this factual dispute is not material to our determination of whether Roark is entitled to qualified immunity under these particular circumstances. Waldron cites no case law, and we find no case law, clearly establishing that these facts support a finding that Roark should have known that Waldron was unaware that Roark and May were law enforcement officers. Thus, even if the facts were as Waldron claims, it would not have been entirely unreasonable for an officer, while in plain clothes and faced with a person who was impeding an arrest pursuant to a warrant, to conclude probable cause existed to arrest Waldron for obstructing government operations. In other words, Waldron has failed to prove the right was clearly established.

Because Roark is entitled to qualified immunity on Waldron's claim that Roark arrested her without probable cause, it is not necessary for this court to address the State's argument that completing a diversion program bars Waldron's § 1983 claim that Roark lacked probable cause under *Heck v. Humphrey*.[47]

### (ii) Excessive Force

[17] Next, we address Waldron's claim that "[t]he right to be free from excessive or deadly force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures."[48] We agree with the general proposition that every citizen should be free from excessive force. However, the framework required by the U.S. Supreme Court for analyzing qualified immunity requires a more particularized inquiry. The "'dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in*

---

[47] *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).

[48] Brief for appellant at 13.

*the situation he confronted.*'"[49] Therefore, we particularize our inquiry to the situation that Roark confronted and we address, when viewing the facts in the light most favorable to Waldron, whether it would have been "'entirely unreasonable' for an officer to believe, in the particular circumstances of this case," that his behavior was lawful.[50]

An arrest may be deemed unreasonable in violation of the Fourth Amendment if the manner in which the arrest is executed is unreasonable, e.g., if the police used excessive force.[51] Here, Waldron argues that Roark used excessive force in effecting her arrest and that Roark is not entitled to qualified immunity.

We view the evidence regarding Roark's use of force in the light most favorable to Waldron. According to Waldron, Roark, followed by May, went down the stairs to look for Copple. When Waldron began to follow the deputies down the stairs, she was instructed not to follow them and to instead "'[s]tay in the kitchen.'" Waldron admits that she did not obey the deputies' instructions and instead continued to follow May down the stairs. Waldron admits that when May stopped halfway down the stairs and put her leg across the stairwell to prevent Waldron from going down the stairs, Waldron pushed on May's leg with her body, attempted to go over her leg, and somehow eventually made her way down the stairs before May.

Waldron testified that after she arrived downstairs, she saw Copple's friend. Waldron claims that this "friend" in her basement was a "stranger," and she started screaming at the friend to "[g]et out of my house." There is no evidence that the deputies were aware Waldron did not know or recognize

---

[49] *Hernandez v. Mesa*, ___ U.S. ___, 137 S. Ct. 2003, 2007, 198 L. Ed. 2d 625 (2017) (emphasis supplied).

[50] *Messerschmidt v. Millender, supra* note 34, 565 U.S. at 549.

[51] See, *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) ("reasonableness depends on not only when a seizure is made, but also how it is carried out").

Copple's friend; nor was there any evidence that the deputies knew that Waldron was screaming at the friend and not at them. In fact, Waldron testified that she thought Roark might have thought she was screaming at him. When asked what Waldron was "hollering," Waldron indicated that she was "[p]robably still [hollering at the friend] to get out of [her] house. And probably to the — and asking — still asking Roark if he had a warrant."

According to Waldron, Roark turned around to handcuff her. She had "no idea" if Roark told her he was going to handcuff her, but she claims that he did not tell her that she was under arrest. According to Waldron, Roark "slapped" one cuff on her left arm, and when Roark started to bring her right hand around, Waldron asked him not to do so and indicated that she had had surgery on her right shoulder. Waldron testified that when Roark tried to bring her right hand around behind her back, she resisted by stiffening her arm and holding it out away from her body, "making a right angle with [her] arm and [her] body." According to Waldron, Roark then "put his knee in [her] back and pulled [her], and [she] fell" forward and broke her eyeglasses. Roark did not make any other contact with Waldron's body as he handcuffed her. Once Waldron was on the ground, Roark was able to cuff her right hand. Waldron did not know if Roark ever asked her to put her hands behind her back.

After she was handcuffed, Roark left Waldron on the floor and continued the search for Copple. Waldron admits that she eventually got up from the floor and slipped her right hand out of the cuff. When Roark turned around and saw that Waldron was up and her hand was out of the cuff, he handcuffed her again. This time, Waldron tried to prevent Roark from handcuffing her by stiffening her left arm and holding it out away from her body. Waldron testified that Roark pulled on her left arm to try to get it behind her back and that Waldron fell. She testified, "I don't think he pushed me down . . . I fell backwards." When she fell backwards, Waldron hit a couch and "bounce[d] off" onto the floor. According to Waldron, she hurt

her left shoulder when she hit the floor. Waldron was then handcuffed a second time, and someone (Waldron was not sure who) took her upstairs.

[18,19] "'Reasonable force,'" which may be used by an officer making an arrest, is generally considered to be that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would deem necessary under the circumstances.[52] The inquiry assesses reasonableness at the moment of the use of force, as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.[53] This allows for the fact that "'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"[54]

On these facts, in *Waldron I* we found that there was "a material question of fact whether . . . the force [Roark] used was excessive."[55] However, this finding is relevant only to the first prong of the qualified immunity analysis, i.e., whether a statutory or constitutional right has been violated. Because Waldron must plead facts to support both prongs, we turn to the second prong, i.e., whether the right alleged to have been violated was clearly established.

Again, Waldron bears the steep burden of proving that this right was so clearly established that every reasonable officer would have known that Roark's conduct under the particular circumstances violated the right. We again find that Waldron has not met this burden.

Waldron argues that her rights are clearly established under *Copeland v. Locke*,[56] wherein the Eighth Circuit found that

---

[52] *Waldron I, supra* note 1, 292 Neb. at 906, 874 N.W.2d at 864.

[53] *Id.*

[54] *Id*. at 906-07, 874 N.W.2d at 864.

[55] *Id.* at 911, 874 N.W.2d at 866.

[56] *Copeland v. Locke*, 613 F.3d 875 (8th Cir. 2010).

there was a material issue of fact as to whether an officer's use of force on a 67-year-old man was excessive. However, the amount of force reasonably depends on the particular facts and circumstances of each independent case. The facts of *Copeland* do not directly align with those in this case, and they are far more egregious. In determining whether a right is clearly established, the question is not whether the very action in question has previously been held unlawful.[57] Instead, the question is whether the contours of the right were sufficiently clear at the time of the challenged conduct that "every 'reasonable officer' would have understood that [the conduct at issue] violates that right."[58]

We conclude that under these facts, the contours of what constitutes reasonable force are not clearly defined. Courts may consider certain factors, such as "'"the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."'"[59] But these factors are not exhaustive.[60]

We think that an officer could reasonably, even if mistakenly, conclude that the amount of force Roark used was lawful given the circumstances. Roark was not in a calm situation in which he was dealing one-on-one with a cooperative Waldron. Rather, at the time Roark used force to arrest Waldron, Waldron had been screaming "get out of my house" while Roark was still trying to assess whether Copple's friend was a danger and while Copple was still at large. Waldron had repeatedly refused to listen to the officers' instructions. At the moment that Roark used force, Waldron was actively resisting arrest.

---

[57] See, *Hernandez v. Mesa, supra* note 49; *Ziglar v. Abbasi*, ___ U.S. ___, 137 S. Ct. 1843, 198 L. Ed. 2d 290 (2017); *Blazek v. City of Iowa City*, 761 F.3d 920 (8th Cir. 2014).

[58] *Ashcroft v. al-Kidd, supra* note 10, 563 U.S. at 741. Accord *Anderson v. Creighton, supra* note 11.

[59] *Waldron I, supra* note 1, 292 Neb. at 907, 874 N.W.2d at 864.

[60] *Id.*

Waldron contends that the "manner in which [the arrest] was performed was objectively unreasonable given [her] age and size."[61] However, even considering her age and size, Waldron repeatedly ignored the officers' instructions to stay in the kitchen, was strong enough to push her way past a deputy and proceed down the stairs, and was nimble enough to work her hands out of the handcuffs.

Even viewing the facts in the light most favorable to Waldron, we conclude that the boundaries of reasonable force that can be applied were not clearly established in this circumstance. Therefore, Roark is entitled to qualified immunity and to summary judgment in his favor.

Before moving to Waldron's next assignment of error, we pause to recognize that our findings in this opinion are slightly nuanced from those in *Waldron I*. In *Waldron I*, we were evaluating whether Waldron's constitutional and statutory rights were violated, and as such, our holding in *Waldron I* is relevant to the first prong of our qualified immunity analysis. Furthermore, in *Waldron I*, we were not faced with the issue of qualified immunity and therefore did not deal with the question of whether the rights alleged to have been violated were clearly established.

In finding that the rights here were not clearly established and that Roark is entitled to qualified immunity, we follow the law set forth in recent U.S. Supreme Court cases. The law has consistently broadened the parameters within which law enforcement officers facing § 1983 claims can operate.[62] For example, in the 2017 U.S. Supreme Court case *White v. Pauly*,[63] an officer arrived late to an ongoing police action.

---

[61] Brief for appellant at 16.

[62] See, *White v. Pauly*, ___ U.S. ___, 137 S. Ct. 548, 196 L. Ed. 2d 463 (2017); *City and County of San Francisco v. Sheehan, supra* note 16; *Ashcroft v. al-Kidd, supra* note 10; *Pearson v. Callahan, supra* note 29; *United States v. Lanier*, 520 U.S. 259, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997); *Anderson v. Creighton, supra* note 11.

[63] *White v. Pauly, supra* note 62.

After witnessing shots being fired by one of several individuals, the officer shot and killed an armed individual without first giving a warning. In analyzing whether the officer violated a clearly established right, the Court stated:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. . . . The Court has found this necessary both because qualified immunity is important to "'society as a whole,'" . . . and because as "'an immunity from suit,'" qualified immunity "'is effectively lost if a case is erroneously permitted to go to trial'" . . . .
>
> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." . . . As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. . . . Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." . . .
>
> . . . .
>
> . . . [The majority] recognized that "this case presents a unique set of facts and circumstances" in light of [the officer's] late arrival on the scene. . . . This alone should have been an important indication to the majority that [the officer's] conduct did not violate a "clearly established" right.[64]

As noted earlier, this is a § 1983 action; we are interpreting a federal statute, not a Nebraska statute; and we must follow U.S. Supreme Court precedent. Although we understand the concerns anytime a citizen is injured during an arrest, U.S. Supreme Court precedent establishes that qualified immunity for § 1983 purposes "'gives government officials breathing room to make reasonable but mistaken

---

[64] *Id.*, 137 S. Ct. at 551-52 (citations omitted).

judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'"[65] After applying U.S. Supreme Court precedent to the instant circumstances, we conclude Roark is entitled to qualified immunity on the above claims.

## 2. Policy and Customs of Lancaster County

We next turn to Waldron's assignment that the district court erred in finding there was no evidence to support her claim that a policy or custom of Lancaster County caused her damages. Waldron argues that "[d]espite the County's official written policies, it is reasonable to infer that Roark's beliefs are premised on the County's unofficial custom of permitting officers to engage in such actions . . . ."[66] We disagree.

[20-23] Municipalities can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where the action alleged to be unconstitutional implements or executes a policy statement or custom of the municipality.[67] However, a municipality cannot be held liable solely because it employs a tortfeasor.[68] In other words, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."[69] "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[70] Conclusions based upon guess, speculation,

---

[65] *City and County of San Francisco v. Sheehan, supra* note 16, 135 S. Ct. at 1774.

[66] Brief for appellant at 25.

[67] *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

[68] *Id.*

[69] *Id.*, 436 U.S. at 691.

[70] *Id.*, 436 U.S. at 694.

conjecture, or a choice of possibilities do not create material issues of fact for purposes of summary judgment.[71]

Waldron contends that the deputies' acts of "forcing their way into a home without showing a badge, refusing to show either [a] badge or a warrant despite repeated requests, and then subjecting the resident to physical force despite the knowledge that she had an injury" amount to official policy by the county.[72] However, the Lancaster County sheriff's office's standard operating procedures contained in the record do not condone any of these actions.

Waldron fails to provide any basis as to why Roark's alleged acts "may fairly be said to represent official policy."[73] Rather, she merely speculates that it is "reasonable to infer that Roark's beliefs are premised on the County's unofficial custom."[74] As evidence of "Roark's beliefs," she relies only on his alleged actions during the events of February 22, 2012. We conclude that this evidence is not sufficient for a jury to infer that Roark's actions that night were an implementation of a custom or an unofficial policy. Waldron's third assignment of error is without merit.

## 3. Liability in Official Capacity

[24] Finally, Waldron assigns that the district court erred in finding that Roark was entitled to summary judgment in his official capacity. However, Waldron does not argue this assignment in her brief. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.[75] Though it is assigned, Waldron does not otherwise

---

[71] *Stones v. Sears, Roebuck & Co.*, 251 Neb. 560, 558 N.W.2d 540 (1997).

[72] Brief for appellant at 25-26.

[73] *Monell v. New York City Dept. of Social Services, supra* note 67, 436 U.S. at 694.

[74] Brief for appellant at 25.

[75] *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016).

argue this assertion. As such, we decline to consider it on appeal.

## VI. CONCLUSION

We do not endorse the kind of officer behavior that Waldron claims she experienced; however, U.S. Supreme Court precedent controls our interpretation of § 1983 and our determination of qualified immunity. Based upon the framework set forth by the U.S. Supreme Court, Waldron has not proved that under these particular circumstances, the rights that she asserts were clearly established.

Accordingly, we conclude that the district court did not err in finding that Roark was entitled to qualified immunity on Waldron's knock-and-announce claim, nor erred in finding that Roark was entitled to qualified immunity on Waldron's unlawful arrest claim. Additionally, the district court did not err in finding that there was no evidence to support a claim that a policy or custom of Lancaster County caused Waldron's damages. Finally, we do not address whether the district court erred in finding that Roark was entitled to summary judgment in his official capacity, because Waldron does not argue this assignment in her brief.

AFFIRMED.

CASSEL, J., concurring.

I join the court's opinion in full. It soundly applies qualified immunity jurisprudence[1] to all of Waldron's claims. Moreover, even if the court's analysis was somehow flawed regarding probable cause for her arrest, the end result would not change. In my opinion, her acceptance and completion of pretrial diversion—in exchange for dismissal of criminal charges—bar that claim.[2]

---

[1] See *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

[2] See *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).

Although I recognize there is a split of authority on the issue, I agree with those courts finding that completion of a diversion program in which the charge is dismissed bars a § 1983 challenge to probable cause.[3]

---

[3] See, e.g., *Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005); *Roesch v. Otarola*, 980 F.2d 850 (2d Cir. 1992); *Cabot v. Lewis*, 241 F. Supp. 3d 239 (D. Mass. 2017) (contrasting competing rationales); *Elphage v. Gautreaux*, 969 F. Supp. 2d 493 (M.D. La. 2013).

Wright, J., dissenting.

I respectfully dissent. In my opinion, no reasonable law enforcement officer would believe that it is lawful to forcibly enter a residence while in plain clothes to arrest a resident without providing any evidence of authority to do so.

As Marilyn Waldron answered her door one evening, a stranger shoved his way past her, into her home, his gun drawn. Another stranger soon followed. They were looking for her grandson. They claimed to be law enforcement officers, but were not in uniform. These strangers were unable or unwilling to produce a badge or a warrant to justify their claim to authority for their intrusion. As instructed to do by her late husband, a captain in the Nebraska State Patrol, Waldron demanded to see a badge and a warrant.

When Waldron, a 78-year-old woman whose right shoulder was tender from a prior surgery, did not immediately comply with the man's order to put her right hand behind her back to be handcuffed, she was pulled to the ground, a knee stuck in her back. Her glasses broke, and her face was bruised. With her shoulder in severe pain, Waldron slipped her right hand out of the handcuffs. The man came at her again. As her arm was wrenched around by the man, the 78-year-old fell backward onto the couch and then to the ground, injuring her other shoulder.

In my opinion, any reasonable law enforcement officer should know that such conduct would violate Waldron's

constitutional rights. I respectfully disagree with the majority's conclusion that Roark is entitled to qualified immunity.[1]

Of particular concern to me is the majority's conclusion that a reasonable officer could have concluded that there was probable cause to arrest Waldron for obstructing government operations. It is, of course, no crime to obstruct an intruder into your home. It is unlawful only if you know that the person you are obstructing is in fact a law enforcement officer.[2]

The majority gives two reasons for why Roark could have reasonably believed that Waldron knew he and May were police officers: (1) They were acting pursuant to an arrest warrant, and (2) "Waldron admits that Roark told her that they were law enforcement officers." The first reason is irrelevant; the fact that Roark and May were acting pursuant to an arrest warrant for Copple—which they were not able or willing to produce when asked by Waldron—has no bearing on whether Waldron knew they were law enforcement officers.

The second reason the majority offers to show that Roark could have reasonably believed that Waldron knew he was a law enforcement officer is that he told her he was. But this verbal claim does not satisfy the requirement that an officer must display his authority. Citizens are not subject to criminal liability for obstructing an unidentified stranger in plain clothes that barges into their home simply because the intruder verbally claims to be the police. Any common burglar can claim to be a police officer. Common sense dictates that citizens not be put to the choice of submitting to an armed home intruder with no evidence of authority beyond a bald verbal claim to be the police and facing the prospect of arrest and criminal prosecution. When a law enforcement officer enters a citizen's home in plain clothes, he must give some evidence of authority

---

[1] See, generally, Claire L. Hillan, *The Not-So-Clearly Established Qualified Immunity Doctrine*, The Nebraska Lawyer, March/April 2017, at 15 (discussing history and details of qualified immunity doctrine).

[2] *Waldron v. Roark*, 292 Neb. 889, 874 N.W.2d 850 (2016).

beyond his mere word in order to have probable cause to arrest the resident for obstructing government operations.

Because I believe that Roark is not entitled to qualified immunity, I respectfully dissent.

For the sake of completeness, I note that the concurring opinion has expressed the view that Waldron's claim that she was arrested without probable cause is barred by her participation in a pretrial diversion program under *Heck v. Humphrey*.[3] My reading of *Heck*, and that of many other courts,[4] is to the contrary. Therefore, in my view, Waldron's participating in pretrial diversion does not bar her claim.

Miller-Lerman, J., joins in this dissent.

---

[3] *Heck v. Humphrey*, 512 U.S. 477, 487, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994) (holding that "a § 1983 suit" is barred when "a judgment in favor of the plaintiff would necessarily imply the invalidity of his [or her] conviction or sentence").

[4] *Vasquez Arroyo v. Starks*, 589 F.3d 1091 (10th Cir. 2009); *S.E. v. Grant County Bd. of Educ.*, 544 F.3d 633 (6th Cir. 2008); *McClish v. Nugent*, 483 F.3d 1231 (11th Cir. 2007) (pretrial intervention program); *Magana v. County of San Diego*, 835 F. Supp. 2d 906 (S.D. Cal. 2011); *Medeiros v. Clark*, 713 F. Supp. 2d 1043 (E.D. Cal. 2010); *Butts v. City of Bowling Green*, 374 F. Supp. 2d 532 (W.D. Ky. 2005). Cf., *Uboh v. Reno*, 141 F.3d 1000 (11th Cir. 1998) (voluntary dismissal of charges by prosecutor); *Adams v. Soyka*, No. 11-CV-00399-LTB-MEH, 2011 WL 4915492 at *3 (D. Colo. Oct. 14, 2011) (holding "*Heck* bar," see *Heck, supra* note 3, inapplicable in case involving "*Alford* plea" and stipulated deferred judgment). See, also, *Wallace v. Kato*, 549 U.S. 384, 392-94, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007) (holding that "*Heck* bar," see *Heck, supra* note 3, which tolls the accrual of the statute of limitations for "§ 1983 . . . claims" until "favorable termination" when applicable, does not apply unless there is "an *extant conviction* which success in that tort action would impugn").